1 | Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
2 | **LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
3 | San Francisco, California 94104
Telephone: (415) 291-2420
4 | Facsimile: (415) 484-1294

5 | *Counsel for Plaintiff BEN SUSCAVAGE*

8 | UNITED STATES DISTRICT COURT

9 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

11 | BEN SUSCAVAGE,                                   Case No. 5:17-cv-06625

12 |            Plaintiff,

13 |    v.                                           **COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

14 | SILVER SPRING NETWORKS, INC., SCOTT A. LANG, THOMAS R. KUHN, THOMAS H. WERNER, JONATHAN I. SCHWARTZ, MICHAEL A. BELL, RICHARD A. SIMONSON, WARREN M. WEISS, PETER F. VAN CAMP, and LAURA D'ANDREA TYSON,    **JURY TRIAL DEMANDED**

           Defendants.

Plaintiff, Ben Suscavage, by his undersigned attorneys, alleges upon investigation of counsel and information and belief, except for his own acts, which are alleged on knowledge, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this action against Silver Spring Networks, Inc., ("Silver Spring" or the "Company") and the Company's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of Silver Spring. Specifically, Defendants solicit stockholder approval in connection with the sale of the Company through a proxy statement that omits material facts necessary to make the statements therein not false or misleading. Stockholders need this material information to decide whether to vote in favor of the merger.

2. On September 18, 2017, the Company announced that it had entered into a definitive agreement (the "Merger Agreement") with Itron, Inc., ("Parent") and Ivory Merger Sub, Inc., ("Merger Sub," and together with Parent, "Itron"), pursuant to which each Silver Spring stockholder will be entitled to receive, per Silver Spring share, $16.25 per share in cash (the "Merger Consideration") in a transaction valued at approximately $830 million (the "Proposed Transaction").

3. In connection with the Proposed Transaction, on November 2, 2017, the Company filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") with the Securities and Exchange Commission ("SEC"). The Proxy Statement is materially deficient and misleading because, inter alia, it fails to disclose material information about the valuation analyses prepared by Silver Spring's financial advisor in connection with the rendering of its fairness opinion and the financial projections for the Company that were relied upon by the Board and the Company's financial advisor in recommending the Proposed Transaction. Without all material information Silver Spring stockholders cannot make an informed decision regarding whether to vote for or against the Proposed Transaction. The failure to adequately disclose such material information constitutes an ongoing violation of Sections 14(a) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed decision in connection with the stockholder vote on the Proposed Transaction.

4. For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws. Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

**JURISDICTION AND VENUE**

5. The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. § 78aa. The Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6. The Court has personal jurisdiction over each of the Defendants because each conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Silver Spring maintains its principal place of business in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

8. Plaintiff is, and has been at all relevant times, the owner of shares of Silver Spring common stock.

9. Defendant Scott Lang ("Lang") has served as the Company's Chairman of the Board of Directors since September 2004 and he has served as our Executive Chairman since

September 2015.

10. Defendant Thomas Kuhn ("Kuhn") has served as a director of Silver Spring since 2005.

11. Defendant Thomas Werner ("Werner") has served as a director of the Company since 2009.

12. Defendant Jonathan Schwartz ("Schwartz") has served as a director of Silver Spring since 2011.

13. Defendant Michael Bell ("Bell") has served as a director of Silver Spring since 2015.

14. Defendant Richard Simonson ("Simonson") has served as a director of Silver Spring since 2009.

15. Defendant Warren Weiss ("Weiss") has served as a director of Silver Spring since November 2003 and as Lead Independent Director from February 2011 until September 2015.

16. Defendant Peter Van Camp ("Van Camp") has served as a director of Silver Spring since November 2013 and as Lead Independent Director since September 2015.

17. Defendant Laura D. Tyson ("Tyson") has served as a director since 2009.

18. Defendants Lang, Kuhn, Werner, Schwartz, Bell, Simonson, Weiss, Van Camp, and Tyson, are collectively referred to as "Individual Defendants" and/or the "Board."

19. Defendant Silver Spring is a corporation organized and existing under the laws of the State of Delaware. The Company maintains its principal executive offices at 230 W. Tasman Drive, San Jose, California 9 513495035. Silver Spring's common stock is traded on the New York Stock Exchange under the symbol "SSNI."

20. The Individual Defendants and Silver Spring are referred to collectively herein as "Defendants."

**OTHER RELEVANT ENTITIES**

21. Parent is a Washington corporation focused on the resourceful use of electricity, natural gas, and water. The Company's technology and services are devoted to providing comprehensive solutions that measure, manage, and analyze energy and water use in order to help utilities responsibly and efficiently manage resources. Parent is a party to the Merger Agreement.

22. Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## FURTHER SUBSTANTIVE ALLEGATIONS

**THE SALES PROCESS**

23. To the shock of 90 million smart endpoints deployed with some of the world's biggest utilities, the longstanding rivalry between the country's two major smart meter and grid networking corporations is ending in a marriage. The Merger, which traces its roots to unsolicited outreach from an undisclosed investment bank in January 2017, stands to create the world's second largest company in the advanced metering business sector.

24. On two separate occasions in January 2017, a representative of an undisclosed investment bank contacted Defendant Lang to discuss potential strategic transaction involving Itron.

25. This outreach was communicated to the Silver Spring Board on January 27, 2017, at which time Silver Spring's Board elected to engage a financial advisor to conduct a process to explore a potential sale of the Company and assess the interest of potential buyers, and to establish a committee of directors consisting of Defendants Van Camp, Schwartz, and Werner to oversee the process (the "Strategy Committee"). As stated in the Proxy Statement, the mandate of the Strategy Committee was limited to overseeing the sale exploration process between meetings of the full Silver Spring Board, and to make a recommendation with respect to the appointment of a financial advisor to assist with a market check process.

26. A few weeks later, during a February 16, 2017 board meeting, Defendant Van Camp suggested that Evercore Group L.L.C. ("Evercore") be considered as Silver Spring's financial advisor due to Evercore's qualifications, experience, reputation, and knowledge of the industry in which Silver Spring operates, and Evercore's experience in similar situations. Although Silver Spring did not enter into an engagement letter with Evercore until July 2, 2017, following several months of negotiations regarding the terms of the engagement letter, Evercore assumed the role of financial advisor almost immediately after being contacted in early 2017.

27. Throughout the months of February and March of 2017, Itron and Silver Spring engaged in preliminary discussions regarding the structure of a potential business combination.

28. While these initial discussions were ongoing, on March 2, 2017, Defendant Bell met with a representative of Party A, a public company that was in the midst of pursuing a strategic partnership, to discuss Party A's interest in a potential business combination transaction with Silver Spring.

29. Throughout late April and early May, Evercore conducted its initial outreach to 22 potential strategic bidders, including Party A, regarding their interest in a potential business combination transaction with Silver Spring. Of the 22 entities contacted, 12 parties indicated that they had no interest in pursuing a business combination transaction with Silver Spring and three parties did not engage after outreach efforts by Evercore.

30. On April 25, 2017, Itron delivered to Defendant Van Camp a non-binding proposal to acquire all of Silver Spring's outstanding common stock on a fully diluted basis at a price between $15.00 and $16.00 per share in cash. The proposal requested that Silver Spring enter into an exclusivity agreement providing for a 30-day exclusivity period during which Itron would conduct due diligence and Itron and Silver Spring would negotiate definitive agreements, and it also included an executed letter from Wells Fargo Securities, LLC indicating that Wells Fargo was highly confident that funded debt financing of up to $1.1 billion could be arranged for Itron's proposed acquisition of Silver Spring.

31. That same day, representatives of Evercore discussed with a representative of a public company ("Party C") that had responded to Evercore's initial outreach regarding Party C's interest in a potential business combination transaction with Silver Spring.

32. On April 28, 2017, a representative of Evercore contacted representatives of a public company ("Party D") that had responded to Evercore's initial outreach regarding Party D's potential interest in a potential business combination transaction with Silver Spring.

33. Between May 2, 2017 and May 22, 2017, representatives of Evercore held discussions with four separate public companies (referred to herein as Party E, Party F, Party G, and Party H) that had responded to Evercore's initial outreach regarding such companies' potential interest in a potential business combination transaction with Silver Spring. During this same period of time each of Party C, Party E, Party F, Party G, and Party H were each provided, and later entered

into, a confidentiality agreement with Silver Spring. The confidentiality agreements with Party E and Party F included a standstill provision similar to the standstill provision included in the confidentiality agreement with Itron. The confidentiality agreements with Party C, Party E, and Party H did not include any standstill provision, due in part to the unwillingness of such entities to enter into a confidentiality agreement that included a standstill provision. Furthermore, none of the confidentiality agreements with Party C, Party E, Party F, Party G, or Party H included an exclusivity provision that would operate to restrict Silver Spring's ability to discuss a potential transaction with other parties.

34. On May 8, 2017, Silver Spring and Itron entered into a previously negotiated confidentiality agreement, which included the standstill provision that generally prohibited Itron from making public proposals to acquire Silver Spring, acquiring Silver Spring securities or taking similar actions (but permitted Itron to make private, non-public proposals to the lead independent director on the Silver Spring Board), and which provided that the standstill provision would no longer apply following any of the execution by Silver Spring of a definitive acquisition agreement with another party or the commencement of a tender offer for 40% or more of Silver Spring's outstanding voting power.

35. With a seeming plethora of potential bidders, on May 24, 2017, acting on the instruction of Silver Spring senior management, representatives of Evercore distributed a bid process letter to Party C, Party E, Party F, Party G, and Party H requesting that each party return an initial non-binding indication of interest describing terms for a potential acquisition of Silver Spring by May 31, 2017. To facilitate this process, on May 26, 2017, representatives of Evercore provided representatives of Itron, Party C, Party F, Party G, and Party H with additional financial information of Silver Spring. However, with the exception of Itron and Party C, all interested bidders chose to withdraw from the process between May 30, 2017 and June 1, 2017.

36. While Party F, Party G, and Party H all elected to withdraw from the bidding process, Itron remained undeterred. On May 26, 2017, a representative of Itron delivered to representatives of Silver Spring a revised non-binding proposal to acquire all of Silver Spring's outstanding common stock at a price of $15.00 per share in cash on a fully diluted basis.

37. Itron's proposal was reviewed by the Silver Spring Board during a June 4, 2017 board meeting, at which time the Board concluded that Itron's price undervalued the Company. Also discussed at this meeting was a recent communication that representatives of Evercore had with a representative of another public company ("Party I"). This contact between Evercore and Party I occurred on June 1, 2017, and six days later on June 7, 2017, Party I entered into a confidentiality agreement which included a standstill provision similar to the standstill provision included in the confidentiality agreement with Itron. Party I's entry into the process was followed shortly by Party J. Party J entered into a confidentiality agreement with Silver Spring on June 19, 2017. The agreement did not include a standstill provision, nor did it include an exclusivity provision.

38. Over the next several weeks, Silver Spring and its representatives continued to meet with Itron, Party C, Party I, and Party J in order to facilitate negotiations and to provide an overview of, and answer questions regarding, Silver Spring's business. While Party I ultimately elected to withdraw from the process on July 18, 2017, on July 20, 2017, representatives of Party C contacted representatives of Evercore and stated that Party C was withdrawing from the process because it would likely decrease its offer to a price below $15.00 per share. Silver Spring continued to engage in negotiations and due diligence with both Itron and Party J. As part of these efforts, the Silver Spring Board decided to present Itron with an $18.00 per share counterproposal.

39. On August 11, 2017, Itron responded to Silver Spring's counterproposal with a third revised non-binding proposal to acquire all of Silver Spring's outstanding common stock at a price of $15.00 per share in cash on a fully diluted basis, which proposal also requested that Silver Spring enter into a 14-day exclusivity period.

40. Throughout the month of August, Silver Spring continued to negotiate with Itron in an effort to increase the consideration being offered. Ultimately, on August 28, 2017, Itron increased its bid to $16.25 per share and indicated that this was the company's best and final offer.

41. While these negotiations were ongoing, representatives of a private equity firm ("Party L"), which had not been previously contacted by Evercore, reached out to Silver Spring regarding Party L's interest in a business combination transaction with Silver Spring. During this same period of time, Evercore reached out to another public company ("Party K") to discuss

Party K's possible interest in a business combination transaction with Silver Spring. Both Party L and Party K each entered into confidentiality agreements with Silver Spring, which included a standstill provision that is alleged to be similar to the standstill provision included in the confidentiality agreement with Itron. However, both Party K and Party L elected to withdraw from the bidding process prior to submitting written proposals.

42. With Itron remaining firm on its bid to $16.25 per share, Silver Spring and Itron, and their respective representatives, proceeded to negotiate open issues in the draft merger agreement and open diligence issues. While these efforts were ongoing, Silver Spring continued to solicit other offers. Two other entities (referred to herein as "Party M" and "Party N"), were contacted regarding their respective interest in pursuing a business combination transaction with Silver Spring. Although Party M and Party N ultimately indicated that neither company was interested in pursuing a business combination transaction with Silver Spring, Silver Spring's efforts were not limited to entities not previously contacted by Evercore. In fact, despite earlier withdrawing from the bidding process in July, Party C continued to hold discussions with Silver Spring. As a consequence of these efforts, on September 6, 2017, Silver Spring contacted a representative of Party C to discuss an additional meeting to be held between Silver Spring senior management and Party C senior management to discuss a potential transaction with Silver Spring.

43. The meeting between Silver Spring representatives and Party C representatives scheduled for September 18, 2017, was never to occur. Rather, after being notified of the potential meeting between Party C and Silver Spring, Itron stated that it would withdraw from the process if there were any delays in signing the Merger Agreement beyond September 17, 2017.

44. Accordingly, despite the ongoing outreach towards Party C, on September 17, 2017, Itron and Silver Spring reached an agreement regarding the final terms of the Merger Agreement. That day, the Board met to vote on the proposed acquisition and, following the presentation of Evercore's fairness opinion, the Board proceeded to approve the Merger Agreement and the Transaction. That same night, the Company and Itron finalized and executed the Merger Agreement and related documents, and on September 18, 2017, the parties issued a joint press release announcing the merger.

**THE MERGER ANNOUNCEMENT**

45. In a press release dated September 18, 2017, Silver Spring announced that it had entered into a Merger Agreement with Itron pursuant to which each Silver Spring stockholder will be entitled to receive $16.25 per Silver Spring share.

46. The press release states in pertinent part:

**LIBERTY LAKE, Wash. and SAN JOSE, Calif. — Sept. 18, 2017** — Itron, Inc. (NASDAQ: ITRI) and Silver Spring Networks, Inc. (NYSE: SSNI) today announced that they have signed a definitive agreement for Itron to acquire all outstanding shares of Silver Spring for $16.25 per share in cash. The transaction is valued at approximately $830 million, net of $118 million of Silver Spring's cash. This represents a premium of 25 percent to Silver Spring's closing share price on Sept. 15, 2017, the last trading day prior to the announcement of the transaction. The transaction has been unanimously approved by the boards of directors of both companies.

Headquartered in San Jose, California, Silver Spring provides Internet of Important Things™ connectivity platforms and solutions to utilities and cities. In 2016, Silver Spring generated revenues of $311 million with a gross margin of 44 percent and ended the year with $1.2 billion of backlog. With its global footprint in the smart utility and smart city sectors, Silver Spring generated more than 20 percent of its revenues through its primarily recurring managed services and SaaS solutions, an area of strategic focus for Itron. To date, Silver Spring has delivered more than 26.7 million network-enabled devices across five continents.

Itron anticipates approximately $50 million in annualized cost synergies to be substantially realized within three years of completing the transaction by optimizing combined operations and expenses. The acquisition is expected to have a positive impact on Itron's long-term growth rate, be accretive to gross margin in the first year after completing the transaction and be accretive to non-GAAP EPS and adjusted EBITDA in the second year, excluding one-time, transaction-related costs and including stock-based compensation costs that Silver Spring currently excludes from its reported non-GAAP results.

"The addition of Silver Spring brings more capabilities to our offerings and advances our strategy of delivering highly secure, value-generating solutions for the critical infrastructure within utilities, smart cities and the broader industrial IoT sector," said Philip Mezey, Itron's president and chief executive officer. "By converging our complementary, standards-based technologies, we will enhance customer efficiencies with solutions that optimize devices, network technologies, outcomes and analytics. This enables us to increase investment in new solutions and accelerate innovation for our combined customer base, covering more than 200 million people.

"This transaction also increases our presence in the sizable industrial IoT segment, driving higher growth with recurring revenues and enabling Itron to increase profitability beyond our mid-teens EBITDA margin target." continued Mezey. "Combining Silver Spring's entrepreneurial culture and proven capabilities with Itron's operational strengths, depth of solutions and customer intimacy will result in a company that is well-positioned in the fast growing critical infrastructure space. We look forward to welcoming Silver Spring's talented team of engineers and professionals to Itron and are confident that together, we are best equipped to provide industry-leading solutions that will deliver greater value to our customers."

Mike Bell, president and chief executive officer of Silver Spring Networks, said, "Joining forces with Itron will enable us to help more utilities and cities adopt the industrial Internet, improve their performance and reliability, and better position themselves for a connected future. This strong combination will address end-to-end solutions for our customers and will create immediate value for our stockholders; it will also provide new opportunities for our employees as part of a larger, global technology leader for the Internet of Important Things."

**Compelling strategic and financial benefits**

- **More value for customers:** Itron envisions it will converge the best of both companies' complementary technologies to provide streamlined solutions on standards-based platforms, allowing the combined company to optimize industrial networks and deliver more solutions that increase value for customers.

- **Large partner ecosystem:** Itron values an open platform approach to industry partners and is committed to supporting multi-vendor offerings for the smart utility and smart city sectors.

- **Enhances value-added services:** With more than 90 million smart endpoints globally from the combined customer bases, Itron will be able to offer customers more outcome-based solutions, creating a large recurring revenue opportunity in the high-growth software and services segment.

- **Accelerates innovation:** The combined company's strong engineering talent, technology and deep data domain expertise will drive greater innovation and support for customers.

- **Significant synergies:** Itron anticipates approximately $50 million of annualized cost synergies within three years of completing the transaction by optimizing combined operating expenses. The transaction also will create additional revenue synergy potential.

- **Accretive transaction:** The acquisition is expected to have a positive impact on Itron's long-term growth rate, be accretive to gross margin in the first year and be accretive to non-GAAP EPS and adjusted EBITDA margin in year two, excluding one-time, transaction-related costs.

Itron plans to finance the transaction using a combination of cash and approximately $750 million in incremental new debt. Fully committed financing has been provided by Wells Fargo.

The transaction is expected to close in late 2017 or early 2018 and is subject to customary closing conditions, including regulatory approval and the approval of Silver Spring's stockholders.

Centerview Partners and Credit Suisse are acting as financial advisors to Itron, and Jones Day is acting as its legal advisor. Evercore is acting as financial advisor and Fenwick & West LLP as legal advisor to Silver Spring.

**THE PROXY STATEMENT IS MATERIALLY INCOMPLETE AND MISLEADING**

47. On November 2, 2017, Silver Spring filed a Proxy Statement with the SEC. As alleged below and elsewhere herein, the Proxy Statement contains material misrepresentations and

omissions of fact that must be cured to allow Silver Spring stockholders to render an informed decision with respect to the Proposed Transaction.

48. As discussed below, the Proxy Statement omits material information regarding the Company's financial projections and the valuation analyses prepared by Evercore in connection with the rendering of its fairness opinion. This material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to Silver Spring stockholders. Accordingly, Silver Spring stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

*Material Omissions Concerning Silver Spring's Financial Projections*

49. The Proxy Statement omits to disclose critical information concerning the financial projections for the Company that were relied upon by the Board and the Company's financial advisor in recommending the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Silver Spring's stockholders that they would rely upon in deciding how to vote on the Proposed Transaction.

50. Here, the Proxy Statement provides projected values for Non-GAAP Gross Profit, Non-GAAP Operating Income, Adjusted EBITDA, Non-GAAP Net Income, and Unlevered Free Cash Flows for projected financial information over the years 2017-2021. However, the Proxy Statement omits to reconcile these non-GAAP projections to the most comparable GAAP measure or otherwise provide the line items used to calculate these measures.

51. As disclosed in the Proxy Statement, Non-GAAP Gross Profit is defined as "the difference between Billings and Cost of Billings." However, no values are provided in the Proxy Statement pertaining to Billings or Cost of Billings.

52. Similar issues abound with regard to the presentation of Non-GAAP Operating Income, Adjusted EBITDA, and Non-GAAP Net Income. The Proxy Statement defines Non-GAAP Operating Income as "operating income adjusted for Billings and cost of non-GAAP revenue and excludes expenses related to the amortization of intangible assets, stock-based compensation, acquisition-related," however, the Proxy Statement omits to disclose (i) amortization of intangible

assets; (ii) stock-based compensation; and (iii) acquisition-related. Likewise, the Proxy Statement defines Adjusted EBITDA as "net income adjusted for changes in deferred revenue and deferred cost of revenue, other (income) expense, net, (benefit) provision for income taxes, depreciation and amortization, stock-based compensation, acquisition related charges, restructuring, legal settlements and certain other items management believes affect the comparability of operating results," but the Proxy Statement omits to disclose values for: (i) net income; (ii) deferred revenue and deferred cost of revenue; (iii) (income) expense; (iv) depreciation and amortization; (v) stock-based compensation; and (vi) acquisition-related charges, restructuring, legal settlements and certain other items. Lastly, the Proxy Statement defines Non-GAAP Net Income as "net income adjusted for changes in deferred revenue and deferred cost of revenue, and excludes expenses related to the amortization of intangible assets, stock-based compensation, acquisition-related charges, income tax benefit related to acquisitions, restructuring and legal settlements." However, as noted previously, the Proxy Statement omits to disclose values for: (i) net income; and (ii) deferred revenue and deferred cost of revenue.

53. Providing these non-GAAP metrics without fully disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projection to GAAP measures, makes the provided disclosures materially incomplete and misleading. Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance. Rather than disclose the information necessary to reconcile these measures, Defendants chose to omit this information.

54. Consequently, the Proxy Statement provides Silver Spring stockholders a number of non-GAAP financial projections that make it extremely difficult for stockholders to assess the fairness of the Proposed Transaction. This is particularly problematic for Silver Spring stockholders, because the Board relied on these non-GAAP metrics in determining to enter into the Merger, and their incomplete disclosure is inherently misleading.

55. The omission of this information renders certain portions of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act including, inter alia, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation

of the Silver Spring Board of Directors"; and (iii) "Certain Prospective Financial Information Reviewed by the Silver Spring Board of Directors and Silver Spring's Financial Advisor."

### *Material Omissions Concerning Evercore's Financial Analyses*

56. The Proxy Statement describes Evercore's fairness opinion and the various valuation analyses it performed in support of its opinions. However, the description of Evercore's fairness opinion and the underlying analyses omits key inputs and assumptions underlying these analyses. Without this information, as described below, Silver Spring public stockholders are being misled as to what weight, if any, to place on Evercore's fairness opinions in determining whether to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Silver Spring stockholders.

57. Specifically, with regard to Evercore's *Discounted Cash Flow Analysis*, the Proxy Statement omits to disclose: (i) the specific inputs and assumptions underlying the discount rate range of 11.5% to 15.5%; (ii) Silver Spring's net cash (calculated as cash and cash equivalents less debt) as of June 30, 2017; (iii) the inputs and assumptions underlying the calculation of the multiple range of 8.0x to 14.0x; and (iv) the inputs and assumptions underlying the calculation of the perpetuity growth rate range of 3.0% to 5.0%; and (iv) the estimated terminal value of Silver Spring.

58. With respect to Evercore's *Present Value of Illustrative Future Share Prices Analysis*, the Proxy Statement omits to disclose the specific inputs and assumptions underlying the discount rate range of 13.5% selected by Evercore in its analysis.

59. With respect to Evercore's *Peer Group Trading Multiples Analysis*, the Proxy Statement omits to disclose the individual multiples Evercore observed for each company and transaction included in the analysis.

60. Similarly, with regard to Evercore's *Premiums Paid Analysis*, the Proxy Statement again omits the individual multiples Evercore observed for each company and transaction included.

61. When a bankers' endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses are crucial to a fair presentation of the material facts. Furthermore, the disclosure of projected financial information provides stockholders with the best

basis to project the future financial performance of a company, and allows stockholders to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be disclosed if Silver Spring stockholders are to make a fully informed decision. The omission of this information renders the statements made concerning the financial advisors' analyses and opinions materially misleading.

62. Without such undisclosed information, Silver Spring stockholders cannot evaluate for themselves whether the financial analyses performed by Evercore were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can evaluate the extent to which Evercore's opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

63. The omission of this information renders certain portions of the Proxy Statement materially misleading, including, inter alia, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the Silver Spring Board of Directors"; and (iii) "Opinion of Silver Spring's Financial Advisor."

*Material Omissions Concerning Party C and the Sale Process*

64. With regard to the omission of material information relating to the sale process leading up to the Proposed Transaction, the Proxy Statement omits to disclose how, and to what extent, Party C, which was actively interested in acquiring the Company prior to July 20, 2017, had reentered the bidding process.

65. On July 20, 2016, representatives of Party C contacted representatives of Evercore and stated that Party C was withdrawing from the process. Despite this apparent withdrawal, the Proxy Statement appears to indicate that Party C and Evercore continued to hold discussions regarding Party C's interest in a strategic transaction. As referenced in the Proxy Statement, several weeks after Party C's apparent withdrawal, Evercore updated both the Board and the Strategic Committee regarding the status of discussions with Party C on August 24, 2017 and August 29, 2017, respectively. However, the Proxy Statement omits to disclose when these discussions

occurred, nor does it provide any details regarding the timing or nature of these discussions.

66.     Clearly, despite the omission of any reference to Party C between July 20, 2017 and August 24, 2017 in the Proxy Statement, discussions involving Party C did occur at some point in this intervening time period and that these discussions led to Party C's renewed interest in a strategic transaction.  This understanding is reinforced by the fact that approximately two weeks later, on September 6, 2017, Party C discussed the scheduling of additional meetings to be held between Silver Spring senior management and Party C senior management to discuss a potential transaction with Silver Spring.  Furthermore, the Proxy Statement indicates that ten days later, Silver Spring provided Party C with additional information pertaining to Silver Spring's recent and potential financial performance, and Silver Spring's strategic fit with Party C.  Again, the Proxy Statement conspicuously omits any information regarding the nature of these discussions, nor does the Proxy Statement disclose whether Party C indicated a willingness to submit a revised indication of interest, or whether Party C made any new indications of what price it would be willing to pay to acquire the Company.  Instead, the Proxy Statement simply notes that on September 17, the day the Merger Agreement was executed, the Board was provided an update on discussions with a representative of Party C.

67.     Accordingly, without further information regarding the nature of these discussions, Company's stockholders are unable to evaluate Party C's renewed interest in making an offer to acquire the Company and just as importantly, how this renewed interest came about and what value(s), if any, were stated or implied during these continued communications with Party C.

68.     The omission of this information renders certain portions of the Proxy Statement materially misleading, including, inter alia, the following sections of the Proxy Statement: (i) "Background of the Merger"; and (ii) "Recommendation of the Silver Spring Board of Directors."

69.     Based on the foregoing, the Proxy Statement violates Section 14(a) of the Exchange Act and applicable SEC regulations by materially misleading Silver Spring stockholders.  Silver Spring public shareholders lack critical information necessary to evaluate the Proposed Transaction.  Moreover, without the key financial information and related disclosures, Silver Spring public stockholders cannot gauge the accuracy and reliability of the financial analyses performed by

1  Evercore, and whether they can reasonably rely on its respective fairness opinions.

2  70.  Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment
3  of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is
4  consummated and to recover damages resulting from Defendants' misconduct.

**CLAIMS FOR RELIEF**

**COUNT I**

**Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder**

9  71.  Plaintiff repeats and realleges each allegation set forth herein.

10 72.  As detailed herein, Defendants disseminated the materially incomplete and
11 misleading Proxy Statement specified above, which contained statements and omissions which, at
12 the time and in the light of the circumstances under which they were made, were false and
13 misleading with respect to material facts and which omitted to state material facts necessary to make
14 the statements therein not misleading, in violation of Section 14(a) of the Exchange Act and SEC
15 Rules promulgated thereunder, including SEC Rule 14a-9.

16 73.  By the use of the mails and by means and instrumentalities of interstate commerce
17 and the facility of a national securities exchange, Defendants solicited and permitted the use of their
18 names to solicit proxies or consents or authorizations in respect of the common stock of Silver
19 Spring.

20 74.  By virtue of their positions within the Company, the Individual Defendants were
21 aware of this information and of their duty to disclose this information in the Proxy Statement.  The
22 Proxy Statement was prepared, reviewed, and/or disseminated by Defendants.  The Proxy Statement
23 misrepresented and omitted material facts, including material information about the sale process for
24 the Company, the consideration offered in the Proposed Transaction, and the actual intrinsic value of
25 the Company's assets.  Defendants were at least negligent in filing and disseminating the Proxy
26 Statement with these materially incomplete and misleading statements and omissions.  Defendants
27 have also failed to correct the Proxy Statement and the failure to update and correct false statements
28 is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

75. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

76. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

77. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

78. The Individual Defendants acted as controlling persons of Silver Spring within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of Silver Spring and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

79. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

80. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.

Thus, they were directly involved in the making of that document.

81. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

82. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A) declaring that the Proxy Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(B) preliminarily and permanently, enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

(C) to the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, awarding Plaintiff rescissory damages against the Individual Defendants, including, but not limited to, pre-judgment and post-judgment interest;

(D) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(E) granting Plaintiff such further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: November 16, 2017                **LEVI & KORSINSKY, LLP**

By: /s/ *Rosemary M. Rivas*
Rosemary M. Rivas
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Counsel for Plaintiff BEN SUSCAVAGE*